# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HARRY YAZUJIAN and :
ALICE YAZUJIAN :
: CIVIL ACTION
      Plaintiffs, :
:
   v. :
: NO.  12-1450
JACOBS PROJECT MANAGEMENT :
CO., :
TEK SOLV, INC., and :
WALTER YASIEJKO D/B/A/ WGY :
CONSULTING :
:
      Defendants. :

## MEMORANDUM

BUCKWALTER, S. J.                                                November 6, 2013

Pending before the Court are the Motion for Summary Judgment by Defendant Jacobs

Project Management, Inc. ("Jacobs") and the Motion for Summary Judgment by Defendant Tek

Solv, Inc. ("Tek Solv").  For the following reasons, Defendant Jacobs's Motion for Summary

Judgment is granted, and Defendant Tek Solv's Motion for Summary Judgment is denied.

## I.       FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiffs are a married couple residing in Pennsylvania.  (Am. Compl. ¶ 1.)  Defendant

Jacobs Project Management Co. ("Jacobs") is a privately-held subsidiary of Jacobs Engineering

Group, Inc., with its principal place of business in Virginia.  (Id. ¶ 3.)  Defendant Tek Solv, Inc.

("Tek Solv") is a Delaware corporation with its principal place of business in California.  (Notice

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

of Removal 2.)  Defendant Walter Yasieljko is a resident of Delaware, doing business as WGY

Consulting, a sole proprietorship with its principal place of business in Delaware.  (First Am.

Compl. ¶ 5.)

Plaintiff Harry Yazujian ("Plaintiff") is a construction laborer who was performing

demolition work to remove a section of a drop ceiling at Amtrak's 30th Street Station in

Philadelphia, Pennsylvania.  (Am. Compl. ¶¶ 10, 13.)  Plaintiff performed the work as an

employee of Merrell & Garaguso, Inc. ("M&G").  (Id. ¶ 8, 13.)  Defendant Jacobs, in its capacity

as the general contractor for the construction project at the 30th Street Station, retained M&G to

perform demolition work associated with "30th Street Station Enhancements."  (Id., Ex. C,

"Design-Build Agreement" at 2; Pl.'s Resp. to Tek Solv's Mot. Summ. J., Dep. of David

Winoski, March 13, 2013 ("Winoski Deposition"), 9:5–8, 10:11–12.)

Several provisions of the "Design-Build Agreement" between Jacobs and M&G

addressed safety.  M&G had "overall responsibility for safety precautions and programs in

performance of the Work."  (Design-Build Agreement, Art. 3.5.1.)  M&G was responsible for

"develop[ing] a safety program" and "advis[ing] Jacobs in writing of measures, if any, necessary

or appropriate to obtain compliance with said program."  (Id., Art. 3.5.2.)  M&G also agreed to

"take all responsible precautions for safety" and "provide reasonable protection to prevent

damage, injury, or loss from all causes to . . . employees performing work on site" and "erect and

maintain . . . reasonable safeguards for safety and protection of persons and property[.]"  (Id.,

Art. 3.5.3 3.5.4.)  Jacobs retained the following right:

> If Jacobs obtains knowledge of a safety violation or other unsafe
> condition on or about the Work Site which has an immediate
> potential or adverse effect on life or property, Jacobs is authorized,

> without prior notice to [M&G], to take all actions deemed necessary
> and appropriate by Jacobs under the then existing circumstances to
> prevent such actual and potential adverse effect and, in such case,
> [M&G] shall be responsible for all Jacobs' costs incurred thereby.  At
> all times [M&G]'s Safety Program and practices and procedures on
> the Worksite shall comply in all respects with the safety policies
> adopted by Jacobs and set forth herein as Attachment "A."[2]

(Id., Art. 3.5.7.)  Another provision of the agreement that did not specifically pertain to safety

gave Jacobs the following general responsibility:

> If Jacobs becomes aware of any error, omission or failure to meet the
> requirements of the Contract Documents or any fault or defect in the
> Work, Jacobs shall give prompt written notice to [M&G].  The failure
> of Jacobs to give such notice shall not relieve [M&G] of its
> obligations to fulfill the requirements of the Contract Documents.

(Id., Art. 4.1.2.)

   Jacobs's on-site representatives included project manager David Winoski.  (Winoski Dep.

9:14.)  Winoski routinely toured the work site, compiled "Safety Observation Reports," and,

when he observed workers who were not wearing their protective equipment, reminded personnel

working on the site to wear their protective equipment.  (Id. at 36:13–23.)

   M&G contracted with Defendant Tek Solv to "[p]rovide Merrell & Garaguso, Inc. with a

Site Safety Professional."  (Id., Ex. F, "Subcontract Agreement" at 1.)  In that subcontract

agreement, Tek Solv further warranted that "work performed . . . [is] free from any defect of

equipment, material or design furnished or workmanship performed by [Tek Solv] or any of its

tier subcontractors or suppliers."  (Id. at 4.)  Tek Solv then hired Defendant Walter Yasieljko

("Yasieljko") "[t]o be a safety person for Merrell and Garaguso."  (Id., Ex. E, Dep. of Bryan

---

[2] Neither Plaintiffs nor Jacobs have attached "Attachment A" to the Design-Build Agreement in
their exhibits.

Jones, Feb.15, 2013 ("Jones Dep."), 10:4–9.)  Tek Solv hired Yasieljko on the basis of his prior

experience working for Tek Solv, his "strong safety background," and knowledge of "safety

requirements in these types of facilities."  (Id. at 12:16–19.)  Additionally, under the

"Subcontract Agreement" with M&G, Tek Solv was obligated to "[d]evelop a project specific

HSE [health and safety] plan."  (Jones Dep. at 16:1–14; Subcontract Agreement.)  Although

M&G "had inquired" about developing a health and safety plan, Tek Solv "never did participate

in" the development of such a plan with M&G.  (Jones Dep., 16:18–20.)

On or about September 27, 2010, Plaintiff reported to the 30th Street Station work site

and participated in a three-to-four-hour  "safety meeting" with Amtrak employees and contractors

new to the site.  (Tek Solv's Mot. Summ. J., Ex. D, Dep. of Harry Yazujian, Jan. 18, 2013,

("Yazujian Dep.") 109:11–24, 111:6–16.)  To Plaintiff's recollection, nothing in the "safety

meeting" concerned Plaintiff's demolition work specifically.  (Id. at 110:14–20.)  Yasieljko also

held a meeting at the start of each work day with "all the individuals that were involved with the

job [to] go over . . . what personal protective equipment was necessary and required, and

precautions."  (Id., Ex. H, Dep. of Walter Yasieljko ("Yasieljko Dep.") at 33:16–20.)  At some

point after Yasieljko started working on the site but before September 29, 2010, at least one

representative of Tek Solv visited the work site to "see the job." (Jones Dep. 11:5–21.)

On September 29, 2010, Plaintiff was demolishing an approximately nine-to-ten-foot-

high drop ceiling in an old restroom area of 30th Street Station.  (Am. Compl. ¶ 10; Yazujian

Dep. 119:17–23; Yasieljko Dep. 13:7–16, 16:13–14.)  To perform his work, Plaintiff stood on an

eight-foot ladder.  (Yazujian Dep. 119:17–23; Yasieljko Dep. 19:4–6.)  The ladder stood on all

four points and was completely opened, but was not otherwise secured.  (Yasieljko Dep.

4

118:8–14.)  While working, Plaintiff stood on the top of the ladder, with the top half of his body

above the ceiling level.  (Yazujian Dep. 194:4–21.)  In his work demolishing the drop ceiling,

Yasieljko had instructed Plaintiff to cut the ceiling in "two-feet sections."  (Yazujian Dep.

152:7–8.)  In order to demolish such a section, Plaintiff had to cut several wires and then "push

down on the section [he] wanted to cut away."  (Id. at 195:1–196:20.)  At approximately 2:45

p.m., approximately fifteen to thirty minutes before the end of his work day, Plaintiff cut away a

section of the ceiling larger than a two-foot section, without cutting all of the wires.  (Id. at

150:10–14, 196:5–13, 245:16–246:2.)  That piece of ceiling fell to the floor, striking the ladder

on which Plaintiff was standing, causing Plaintiff to fall to the floor. (Tek Solv's Mot. Summ. J.,

Ex. I, Deposition of Francis Pratt ("Pratt Dep."), Feb. 25, 2013, 33:2–13.)  The fall caused

injuries to Plaintiff's spine, pelvis, torso, wrist, head, and shoulders.  (Am. Compl. ¶ 23.)

Plaintiffs initiated the present litigation by filing a complaint, on February 14, 2012 in the

Court of Common Pleas of Philadelphia County.  (Notice of Removal 2.)  On March 22, 2012,

Defendant Jacobs removed this case from the Court of Common Pleas of Philadelphia County to

this Court.  (Id. at 1.)  After some initial motion practice, Plaintiffs filed their Amended

Complaint on September 18, 2012.  Plaintiffs set forth two causes of action: Counts I–III allege

that Defendants were negligent.  (Am. Compl. ¶¶ 31–36.)  Counts IV–VI[3] claim loss of

consortium.  (Id. ¶¶ 37–43.)

Defendant Tek Solv filed its pending Motion for Summary Judgment on June 5, 2013.

Defendant Jacobs filed its pending Motion for Summary Judgment on June 12, 2013.  Plaintiffs

[3] In the First Amended Complaint, Plaintiffs set forth "Count V" twice.  (Am. Compl. ¶ 43–45.)
The Court will refer to the second "Count V" as "Count VI."

5

filed a Response in Opposition to Tek Solv's Motion on June 26, 2013 and a Response in

Opposition to Jacobs's Motion on July 2, 2013.  Defendant Jacobs filed a Reply to Plaintiffs'

Response to its Motion on July 10, 2013.  Defendant Tek Solv filed a Reply to Plaintiffs'

Response to its Motion on July 12, 2013.  Plaintiffs filed a Sur-Reply to Jacobs on July 16, 2013.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a

reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and

decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of

Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-

Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence,

and all reasonable inferences which may be drawn from it, in the light most favorable to the non-

moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

(citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning

Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by

both sides, the court must accept as true the allegations of the non-moving party, and "all

justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine

issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

**III.     DISCUSSION**

**A.      Defendant Jacobs's Motion for Summary Judgment**

It is a well-settled general rule in Pennsylvania that "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."  Beil v. Telesis Const., Inc., 11 A.3d 456, 466 (Pa. 2011) (quoting Restatement (Second) of Torts **§** 409).  Accordingly, as a general rule, general contractors are not liable for physical harm to third parties resulting from the acts or omissions of its subcontractors. See Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 470 (E.D. Pa. 2011); Leonard v. Commonwealth, 771 A.2d 1238, 1242 (Pa. 2001); Hader v. Coplay Cement Mfg. Co., 189 A.2d 271, 277 (Pa. 1963).  The rule is predicated on the idea that "safety responsibility best rests on the subcontractor doing the work, for that party is most familiar with the work and its particular hazards."  Leonard, 771 A.2d at 1242.

7

Among the exceptions to the rule against general contractor liability is the so-called

"retained control" exception:

> One who entrusts work to an independent contractor, but who retains
> the control of any part of the work, is subject to liability for physical
> harm to others for whose safety the employer owes a duty to exercise
> reasonable care, which is caused by his failure to exercise his control
> with reasonable care.

Beil, 11 A.3d at 466 (quoting Restatement (Second) of Torts § 414).  The Supreme Court of

Pennsylvania has instructed that the "retained control" exception is  meant to be drawn narrowly:

> It is not enough that he has merely a general right to order the work
> stopped or resumed, to inspect its progress or to receive reports, to
> make suggestions or recommendations which need not necessarily be
> followed, or to prescribe alterations and deviations. Such a general
> right is usually reserved to employers, but it does not mean that the
> contractor is controlled as to his methods of work, or as to operative
> detail.

Id. (quoting Restatement 2d of Torts § 414 cmt. c).  Instead, for a claim against a general

contractor for an injury caused by the act or omission of its subcontractor to survive a motion for

summary judgment, the plaintiff must show that the general contractor had "such a retention of a

right of supervision that the [sub]contractor is not entirely free to do the work in his own way."

Id.  Before turning to the present case, it is instructive to examine the facts of previous cases

applying the "retained control" exception to illustrate just how narrow this exception is under

Pennsylvania law.

### 1. "Retained control" cases

In numerous cases, the Pennsylvania appellate authorities have upheld grants of summary

judgment to general contractor defendants despite the plaintiffs's arguments for the application

of the "retained control" exception.  In Leonard v. Commonwealth, the plaintiff, Leonard, was an

employer of a sub-subcontractor on a project demolishing and rebuilding certain bridges along Interstate 476 in Delaware County. 771 A.2d at 1239. The Pennsylvania Department of Transportation (PennDOT) hired Kiewitt/Perini to be the general contractor for the project. Id. Kiewitt/Perini entered into a contract with subcontractor High Steel to make and install steel for the bridges. Id. High Steel hired sub-subcontractor Cornell to erect the steel. Id. Plaintiff Leonard was an employee of Cornell. Id. While performing his work, Leonard wore a safety belt that was not properly fastened to any safety device and fell forty feet, suffering serious injuries. Id. Among others, Leonard sued general contractor Kiewitt/Perini for negligence. Id.

To support his "retained control" argument against Kiewitt/Perini, Leonard cited language from the contract between Kiewitt/Perini and PennDOT that stated Kiewitt/Perini would "secure compliance with various Occupational Safety and Health Administration (OSHA) regulations governing work site safety" including those explicitly enumerated in the contract that dealt with "safety lines," and "safety nets." Id. at 1241 (citing 29 C.F.R. 1926.104–105). Despite the specificity of Kiewitt/Perini's contractual duties to PennDOT as they pertained to "safety belts, lifelines, and lanyards" and "safety nets," the Supreme Court of Pennsylvania held that summary judgment for Kiewitt/Perini was proper because "the fact that OSHA requirements were applicable to the project does not, however, mean that Kiewit/Perini . . . had a presence at the site or control over the work done by Cornell. Absent those elements, liability does not attach." Id. at 1241.

In Hader v. Coplay Cement Manufacturing Company, the plaintiff, Hader, was an employee of a contractor working on the installation of a stone crusher at a quarry in Lehigh County owned by the Coplay Cement Manufacturing Company. 189 A.2d at 272–73. Coplay

retained Kennedy Van Saun Manufacturing & Engineering Corporation to manufacture and "deliver" the stone crusher.  Id. at 273.  The contract between Coplay and Kennedy specified that the stone crusher was not "delivered" into Coplay's possession until Coplay had fully paid for it.  Id. at 275.  Coplay contracted with Lloyd S. Keifriter to unload, assemble, and install the stone crusher. Id. at 274.  Plaintiff Hader was an employee of Keifriter.  Id.  Overseeing the installation were Henry Miller, Coplay's plant supervisor, D.J. Uhle, Coplay's vice president, and Edward Warfield, a field supervisor for Kennedy.  Id. at 275, 278.  One day, Hader was carrying a heavy bolt while walking along the top of a girder when he slipped and fell thirty-five feet, causing him serious injuries.  Id. at 273–74.  Hader sued both Coplay and Kennedy for negligence.  Id. at 274.

At trial, Hader presented evidence that Miller and Uhle of Coplay oversaw the work, visiting the site on a daily basis.  Id. at 278.  Further, Hader showed that Warfield, an employee of Kennedy "borrowed" by Coplay, and had actively supervised the installation of the stone crusher, instructing Keifriter's employees— including the plaintiff Hader— on the specific steps necessary to safely install the stone crusher and "act[ing] as a 'watchdog' for Coplay to make sure that Keifriter installed the crusher and erected the housing in accordance with the plans and specifications."  Id. at 275, 278.  Yet, at the close of evidence, the Court of Common Pleas granted both Coplay and Kennedy a nonsuit.  The Supreme Court of Pennsylvania upheld the Court of Common Pleas' grant of nonsuit, finding that these facts presented "not a scintilla of evidence of any negligent conduct on the part of Kennedy which in any wise contributed to the happening of this accident" and "in nowise demonstrated any control by Coplay of the manner of installation of the crusher."  Id. at 276, 278.

One of the cases in which a plaintiff presented evidence of a hiring party's retention of

control sufficient to make it a jury triable issue is <u>Byrd v. Melvin</u>. 317 A.2d 280 (Pa. 1974). In

that case, defendant Ollin commissioned renovations on an office building that he owned.[4]

<u>Byrd</u>, 317 A.2d at 281. Ollin hired Merwin to act as general contractor on the project.[5] <u>Id.</u> Ollin

also hired Walsh to complete electrical work that general contractor Merwin was unable to

complete. <u>Id.</u> The plaintiff, Byrd, was an employee of Walsh. <u>Id.</u> Plaintiff Byrd suffered

injuries when Merwin's son dropped a prefabricated staircase on his leg. <u>Id.</u> Byrd sued Ollin

and Merwin for negligence.

　　　At trial, Byrd argued that Ollin retained control sufficient to make him liable for the

injuries that he suffered. <u>Id.</u> at 282. Among the evidence plaintiff put on to support his argument

was: testimony from Walsh that Ollin had personally instructed him on when and in what area to

begin his work; testimony from Merwin that he was "second in command" on the work site and

that Ollin was in control of the work; and testimony from plaintiff that Ollin had ordered that the

electric work start before the installation of the staircase, as opposed to the more general custom

of installing the staircase before the commencement of electrical work. <u>Id.</u> The Supreme Court

of Pennsylvania reversed the Court of Common Pleas' grant of a judgment notwithstanding the

verdict to Ollin. <u>Id.</u> In a short opinion, the court concluded that "[t]hese facts clearly establish

that Olin exercised that degree of control that is required by § 414 in order to impose liability"

and remanded the case back to the Court of Common Pleas for a new trial. <u>Id.</u>

---

[4] The portion of the <u>Byrd</u> opinion relevant here concerns whether a property owner retained control sufficient to be liable for injuries to the employee of an electrician. When acting as a hiring party, a general contractor is subject to the same "retained control" analysis as a property owner under § 414. <u>Warnick</u>, 516 F. Supp. 2d at 470.

[5] Merwin, the general contractor in this case, did not file an appeal in this case and the Supreme Court did not make any holding as to his liability to the plaintiff. <u>Id.</u> at 281, n.1.

## 2. "Retained control" applied to the present case

Turning to Defendant Jacobs' Motion, Jacobs argues that it should be granted summary judgment because it did not retain control over the demolition work performed by its subcontractor M&G, nor have Plaintiffs presented any evidence that Jacobs retained any control over M&G's work.  Plaintiffs respond in their opposition that Jacobs retained control sufficient to invoke the § 414 exception to the general rule against hiring party liability for independent contractor negligence.

### a. "Retained control" by contractual language

The first way that a plaintiff may prove a hiring party's retention of control over an independent contractor is "to point to contractual provisions giving the [hiring party] control over the manner, method, and operative details of the work."  Beil, 11 A.3d at 467.  To support its contention that Jacobs retained control over M&G's work, Plaintiffs point to several provisions of M&G's Design-Build Agreement with Jacobs, including one provision governing safety.  However, these provisions do not demonstrate the retention of control necessary to invoke the § 414.

Plaintiffs point to Article 3.5.7 which states, in relevant part, that if Jacobs "obtains knowledge of a safety violation or other unsafe condition on or about the Work Site which has an immediate potential or adverse effect on life or property," then Jacobs would have the authority to immediately "take all actions deemed necessary and appropriate by Jacobs under the then existing circumstances to prevent such actual and potential adverse effect."  (Design-Build Agreement, Art. 3.6.7.)  While this language does pertain to safety, it does not specifically give Jacobs "control over the manner, method, and operative details of the work."  Beil, 11 A.3d at

12

467.  Rather, it gives Jacobs the authority, upon discovery of "a safety violation or other unsafe condition," to stop work and take "all actions deemed necessary and appropriate."  It would run counter to public policy to hold that a safety provision giving Jacobs an opportunity to intervene upon the discovery of an unsafe condition makes Jacobs liable for the negligence of its subcontractors.  As the Supreme Court of Pennsylvania has stated, "sound public policy dictates" that:

> a [hiring party] retaining a certain degree of authority over safety issues, such as supervising and enforcing safety requirements, and even imposing its own safety requirements at a work site, does not constitute control for purposes of imposing liability.

Id. at 469.

It is also worth noting that this provision deals with "safety issues" in only the broadest of terms.  In Leonard, the plaintiff fell forty feet due to a faulty safety belt and plaintiff pointed to provisions of the contract between the general contractor and plaintiff's subcontractor employer that dealt explicitly with "safety lines," and "safety nets."  771 A.2d at 1241.  Yet, even with contractual language that so specifically addressed the hazard that caused the plaintiff's injuries, the Supreme Court of Pennsylvania held that such a provision "does not, however, mean that [the general contractor] . . . [had] control over the work done by [plaintiff's employer]."  Id.  In light of Leonard, the provision in the Design-Build Agreement between Jacobs and M&G that deals only generally with "safety issues" cannot show Jacobs's retention of control.

Plaintiffs also cite Article 4.1.2 of the Design-Build Agreement, a general provision that does not specifically address safety, which states that if Jacobs discovered "any error, omission or failure to meet the requirements of the Contract Documents or any fault or defect in the Work,

13

Jacobs shall give prompt written notice to [M&G]."  As this Court has previously noted, "general duties under a contract to supervise the subcontractor and monitor its work do not make the general contractor liable under Section 414's 'retained control' exception."  Warnick, 516 F. Supp. 2d at 476.  The contractual duty for Jacobs to "give prompt written notice" to M&G for "any error, omission or failure to meet the requirements" of its agreement or "defect in the Work," is just the sort of "general dut[y]" to which this court referred.  It does not show Jacobs's retention of control over M&G  under the contract.

### b.   "Retained control" by exercise of control

The second way plaintiffs may prove a hiring party's retention of control over an independent contractor under § 414 is to "demonstrate that the [hiring party] exercised actual control over the work."  Beil, 11 A.3d at 467.  In their Response to Jacobs's Motion, Plaintiffs point to several excerpts of testimony from Jacobs project manager David Winoski to show Jacobs's exercise of actual control over M&G's work, including his testimony that he ensured "work was getting done in accordance with the contract documents," (Winoski Dep. 12:16–18), and that when he observed M&G personnel not wearing their protective gear and instructed them put on their protective gear.  (Id. at 36:13–23.)

It is instructive to read Winoski's testimony alongside the facts of other "retained control" cases.  In Hader, there had been testimony from the hiring party's representative that he had actively supervised the installation of a stone crusher and had instructed workers, including the plaintiff, on the specific steps necessary to install the stone crusher, and that he had been "act[ing] as a 'watchdog' for [the hiring party] to make sure that [plaintiff's employer] installed the crusher and erected the housing in accordance with the plans and specifications."  189 A.2d.

14

at 275, 278.  Yet, the Supreme Court of Pennsylvania found that this testimony "in nowise demonstrated any control by [the hiring party] of the manner of installation of the crusher."  Id. at 278.

In Byrd, the plaintiff, an employee of an electrician, had been injured when a pre-fabricated staircase.  317 A.2d at 281.  Plaintiff had proven that the hiring party had specifically ordered that the electric work start before the installation of the staircase, as opposed to the more general custom of installing the staircase before the commencement of electrical work.  Id. at 282.  In that case, the Supreme Court of Pennsylvania overturned the grant of a nonsuit to the hiring party, finding that those facts "establish that [the hiring party] exercised that degree of control that is required by § 414 in order to impose liability[.]"  Id.

Here, Plaintiffs have not pointed to any evidence that Winoski or any other representative of Jacobs exercised any control to the level of the hiring parties in Byrd, or even Hader. Plaintiffs do not show that Jacobs did anything to specifically dictate M&G on how to go about its demolition work such that it led to Plaintiff's injuries in the way that the hiring party's insistence on installing the staircase before the electrical work led to the plaintiff's injury in Byrd.  Plaintiffs do not even show that anyone from Jacobs specifically instructed M&G on the finer points of how to properly conduct its demolition as the hiring party specifically instructed the plaintiff on the installation of the stone crusher in Hader.[6]  All Plaintiffs can show by Winoski's testimony is the exercise of a "general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need

---

[6] See also Farabaugh v. Pa. Turnpike Comm'n., 911 A.2d 1264, 1273 (Pa. 2006). (General contractor showing a safety video to all work site personnel and retaining an on-site safety inspector did not demonstrate retention of control by general contractor.)

15

not necessarily be followed, or to prescribe alterations and deviations." Warnick, 516 F. Supp.

2d at 467 (quoting Restatement (Second) of Torts, 414 cmt. c).  Jacobs's exercise of that "general

right" does not show the "retention of a right of supervision that the contractor is not entirely free

to do the work in his own way." Id.

Finally, Plaintiffs point to the fact that after the accident that caused their injuries, Jacobs

instituted what Winoski referred to in his testimony as a "Safe Plan of Action."  (Winoski Dep.

45:2–14.)  The fact that Jacobs designed a "Safe Plan of Action" after the accident cannot be

used to prove that Jacobs exercised actual control over the work site before the accident.  As this

Court has stated previously:

> It would go against public policy to hold that [a general contractor]
> "retained control" simply because of the safety measures they took.
> If a landowner or general contractor knows about a subcontractor's
> employee performing an activity unsafely, the landowner or general
> contractor should be encouraged to speak up.  If they were deemed to
> have "retained control" in this situation, then [the general contractor]
> would, in the future, be silent when notified of an unsafe condition,
> in order to protect themselves. It is doubtful that Pennsylvania would
> want to discourage hiring parties from notifying contractors about
> possible safety violations.

Warnick, 516 F. Supp.2d at 476.  To that end, Plaintiffs cannot point to Jacobs's "Safe Plan of

Action" as evidence that it exercised control over M&G's work.

Plaintiffs have not shown by either contractual language or by Jacobs's conduct that

Jacobs retained any control over the work M&G performed as Jacobs's subcontractor sufficient

to invoke the exception to the rule against hiring party liability in § 414.  Plaintiffs do not assert

any other grounds for holding Jacobs liable.  Accordingly, the Court must grant Jacobs's Motion

for Summary Judgment.

### B.    Defendant Tek Solv's Motion for Summary Judgment

Defendant Tek Solv also moves for summary judgment.[7]  Tek Solv argues that it should

not be held liable for Plaintiff's injuries and should be granted summary judgment because it met

its obligations under the Subcontract Agreement that it made with M&G.  (Tek Solv's Mot.

Summ. J.,  Ex. F, "Subcontract Agreement".)  Specifically, Tek Solv asserts that it met its

obligations under the Subcontract Agreement to "provide Merrell & Garaguso, Inc. with a Site

Safety Professional" for "(8) hours/day, five (5) days/week[.]" when it hired Defendant Walter

Yasieljko to be its site safety professional.  (Id.)  Tek Solv extrapolates that in hiring Yasieljko, it

met its duty to Plaintiffs.  Plaintiffs respond that Tek Solv is still liable for their injuries because

it failed "to exercise reasonable care to employ a careful and competent contractor to do work a)

which will involve a risk of physical harm unless it skillfully and carefully done, or b) to perform

any duty which the employer owes to third persons."  Wilk v. Haus, 460 A.2d 288, 294 (Pa.

Super. Ct. 1983) (quoting Restatement Second of Torts § 410)).

In Pennsylvania, to prevail on a claim of negligence, a plaintiff must prove that: 1) the

defendant owed a duty of care to the plaintiff; 2) the defendant breached that duty; 3) the breach

resulted in injury to the plaintiff; and 4) the plaintiff suffered an actual loss or damage.  Martin v.

Evans, 711 A.2d 458, 462 (Pa. 1998).  Tek Solv is correct that a defendant may offer contractual

language as evidence of the duty of care in performing the contract, "leaving courts to consider

on a case by case basis whether such responsibilities trigger a duty to other workers on the

---

[7] Within Tek Solv's Motion for Summary Judgment is an argument to preclude the expert opinion of Dr. Alan E. Meade, P.E. under Rule 702 of the Federal Rules of Evidence.  The Court does not consider Dr. Meade's opinion for purposes of this Motion, nor does it make a ruling as to the admissibility of Dr. Meade's opinion.  Issues concerning the foundation for an expert witness' opinion under Rule 702 may be raised again in a motion in limine prior to trial.

jobsite." Farabaugh v. Pa. Tpk. Comm'n, 911 A.2d 1264, 1282 (Pa. 2006).  The four corners of a contract cannot be the end of the inquiry as to a defendant's duties to third parties.  As the Supreme Court of Pennsylvania has instructed:

> Despite factual questions regarding the details of [the defendant's] safety responsibilities, we may still consider whether the general safety obligations assumed in the contract could trigger a duty to others on the jobsite actionable in tort. It has long been the law of this Commonwealth that a contracting party may owe a duty, imposed by law and society, to perform its contractual obligations in such a manner as to avoid injury to third parties[.]

Farabaugh 911 A.2d at 1283 (Pa. 2006).

The Court will not make a finding as to whether Tek Solv met its contractual obligations to M&G.  However, even assuming *arguendo* that Tek Solv did meet its obligations under the Subcontract Agreement, that is only the beginning of the question of whether Tek Solv met its duties to Plaintiffs.  To determine whether any of Tek Solv's contractual duties to M&G "trigger[ed] a duty to others on the jobsite actionable in tort," the Court must refrain from making a finding that is properly made by a finder of fact.  Accordingly, the Court cannot grant summary judgment to Tek Solv on this ground, and will deny Tek Solv's Motion for Summary Judgment.

## IV. CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant Jacobs Project Management Co.'s Motion for Summary Judgment and deny Defendant Tek Solv, Inc.'s Motion for Summary Judgment.

An appropriate order follows.